COMMONWEALTH *vs.* WALTER J. JONES.

Suffolk.   May 3, 1972. — September 18, 1972.

Present: TAURO, C.J., REARDON, QUIRICO, BRAUCHER, & HENNESSEY, JJ.

*Identification. Practice, Criminal,* Judicial discretion, Location of defendant in court room. *Evidence,* Opinion:. expert. *Arrested Person. Police.*

In a robbery case, there was no abuse of discretion by a judge, acting as trier of fact, who refused to permit a defendant to sit among the spectators for the purpose of in-court identifications, rather than at his counsel's table or in the dock.   [500–501]

In a robbery case, there was no error in the refusal of a judge, acting as trier of fact, to permit a psychologist and a psychiatrist to testify as to the capacity of identifying witnesses to observe accurately and remember correctly.   [501–502]

It was reversible error not to suppress evidence of an accidental station house identification of the defendant as a robber which occurred while the defendant was intentionally being deprived of his right under G. L. c. 276, § 33A, to use a telephone.   [502–504] QUIRICO, J., dissenting.

INDICTMENT found and returned in the Superior Court on February 8, 1971.

The case was heard by *Dwyer,* J.

*Brian T. Callahan* (*Edwin C. Hamada & Jerry E. Benezra* with him) for the defendant.

*Robert N. Gross,* Assistant District Attorney, for the Commonwealth.

TAURO, C.J.   The defendant appeals under G. L. c. 278, §§ 33A–33G, from his conviction, after a jury waived trial, on counts 1 and 3 of an indictment charging him with armed robbery of two women at the Pi Alley Theatre, Boston, on January 12, 1971.[1]   Execution of the

---

[1] Count 2 of the indictment was not tried but was placed on file with a plea of not guilty.

defendant's sentences to indeterminate terms at the Massachusetts Correctional Institution at Concord has been stayed pending appeal to this court.

The pertinent facts may be summarized as follows: On the night of the robbery, at approximately 9:40 P.M., Miss Karen Small, the inside cashier at the theatre, was preparing to finish work, when three black men entered the lobby. At the time, Miss Small had been joined inside the ticket booth by Mrs. Irene Borrazzo, a friend. The ticket taker told the men to buy their tickets at the outside ticket booth, but Miss Small said it would not be necessary to go outside. Two of the men then approached the women, while the third man remained near the candy counter. The first man, now in front of Miss Small, said they wanted money — not tickets. Simultaneously, he and the second man pulled out guns. Miss Small handed the first man $21, including $11 of her own money, and Mrs. Borrazzo turned over twenty-nine cents. All three men then left the theatre.

During the robbery, the first man stood in front of Miss Small at a distance of a few feet for four to five minutes. The second man, later identified as the defendant, stood within three feet of Mrs. Borrazzo for a minute and a half, then roamed the immediate area, but returned shortly to his original position. In all, Mrs. Borrazzo was face to face with the second man for about three minutes, and she also watched him as he moved about near the ticket booth. While at the booth itself, the second man was also directly in view of Miss Small. The lighting was adequate for observation, and both women were able to observe physical and facial characteristics of the two gunmen as well as their manner of dress.

Shortly after the robbery, the women gave police officers detailed descriptions which were then broadcast over the police radio. The second man was identified in the broadcast as a dark skinned Negro male, medium in height, with a short Afro, a mustache, "fuzz" on the chin, and gold wire-rim glasses, who was neatly dressed and

wearing a three-quarter length tan coat. At approximately 10:40 P.M., Officers Sullivan and Fiandaca, who had heard this broadcast, spotted the defendant as he was entering a lounge at the corner of Tremont and Stuart streets. Because the defendant fit the description broadcast for the second man, the officers proceeded to make an arrest. After advising the defendant of his constitutional rights, they transported him to the district 1 station house where he was booked and placed in a cell.

After the defendant was in a cell, Officer Sullivan telephoned the witnesses who assented to come to the station house for further questioning. Both officers then picked up Miss Small and Mrs. Borrazzo and brought them to district 1. At approximately 1 A.M., while the officers were questioning the women in the lobby of the station house, the defendant was led through on the way to a waiting van which took him to police headquarters for fingerprinting and photographing.[2] The defendant at the time was dressed in his tan coat and was walking at a normal pace, in handcuffs, between two uniformed police guards. Spontaneously, each woman identified him: "That's him," and "That's the one." The defendant was in the lobby for no more than a minute. During this time, neither Officer Sullivan nor Officer Fiandaca asked any questions about him or in any way directed the witnesses' attention to him.

The desk officer, who was responsible for ordering the defendant taken through the lobby, testified that he did not know who the women were or why they were at the station house. Although both women were aware that the police had a suspect in custody fitting the description of the second man in the robbery, they received no advance indication of the defendant's entrance into the

---

[2] In addition to this confrontation with the witnesses, the defendant testified at voir dire concerning a second meeting. His testimony was that, prior to being led through the station house lobby, he was required to stand in front of a door containing a glass window through which the witnesses viewed him. The police and both women, however, denied any knowledge of such an occurrence, and the judge in his findings rejected the defendant's testimony on this score as being either "untruthful or inaccurate."

lobby.   Nor were they led to believe that the suspect would be exhibited to them.   They were told only that they were at the station house to expand upon their previous descriptions, if possible.

After his arrest, the defendant repeatedly asked for the opportunity to make a telephone call to his employers who were staying at the Parker House hotel, and with whom he claimed to have been at the time of the holdup. At district 1, he was informed of his statutory right to use a telephone (G. L. c. 276, § 33A) as well as of his constitutional rights, but he was never allowed to make a call.   At approximately 1:30 A.M., after the witnesses had been returned home, the police went to the hotel and contacted the defendant's employers (two clothiers) themselves.   The employers then went to district 1 where they met with the defendant.   At trial, they testified that the defendant had not left the hotel until past 10 P.M., more than twenty minutes after the time of the robbery.

1. One assignment of error argued relates to the refusal of the trial judge to permit the defendant to sit among the spectators at voir dire and at trial.   The defendant's contention under *Stovall* v. *Denno*, 388 U. S. 293, is that the prosecution witnesses could not make a reliable identification of him while he was required to sit at his counsel's table during voir dire or in the dock at trial.

Mistaken identification is a danger which may arise in the course of trial proceedings as well as beforehand when the defendant is in police custody.   While there is clearly an element of suggestion in the relative isolation of the defendant at the defence table or in the dock (see *United States* v. *Williams*, 436 F. 2d 1166, 1168 [9th Cir.]), counsel is present to "ferret out [any] suggestive influences" which he perceives in in-court identification procedures.   Cf. *United States* v. *Wade*, 388 U. S. 218, 234–237.   In representing the defendant, counsel has the responsibility, by way of cross-examination, to bring to the attention of the trier of facts any circumstances which tend to cast doubt upon a witness's identification

testimony.  If counsel moves for an in-court lineup or to seat the defendant in the court room audience, we think it is within the sound discretion of the trial judge whether to grant the request.[3]   Absent a showing of an abuse of discretion which prejudices the defendant's opportunity for a fair trial, we will not disturb the judge's ruling.

In the instant case, the defendant has failed to show any such abuse of discretion.  It was not argued at voir dire or at trial that the identifying witnesses were unusually impressionable or otherwise unreliable.  Furthermore, at voir dire, the trial judge found, with ample evidentiary support, that the witnesses' encounter with the robbers at the theatre provided sufficient basis for in-court identifications independent of the police station confrontation.  Finally, the trial was before the judge himself, a lawyer highly experienced in evaluating testimony for its reliability, and not before a jury less aware of the hazards of eyewitness identification.

2.  The defendant also assigns as error the refusal of the trial judge to permit a psychologist and a psychiatrist to testify at voir dire as to the capacity of the identifying witnesses to observe accurately and to remember correctly.

"[T]here is no room for the opinion of an expert if the subject of his testimony is of such a nature that it may be presumed to be within the common experience of men." *Flynn* v. *Growers Outlet, Inc.* 307 Mass. 373, 376. *Commonwealth* v. *Makarewicz,* 333 Mass. 575, 591.  See *Commonwealth* v. *Gardner,* 350 Mass. 664, 667, and cases cited.  The admission of expert testiminy lies in the sound discretion of the trial judge.  Here, the proffered

---

[3] Other jurisdictions, we note, have reached similar conclusions. See *United States* v. *Moss,* 410 F. 2d 386, 387 (3d Cir.) ; *United States* v. *Edwards,* 321 F. Supp. 32, 33 (E. D. Pa.) (following the *Moss* case) ; *United States* v. *Williams,* 436 F. 2d 1166, 1168–1169 (9th Cir.) ; *United States* v. *MacDonald,* 441 F. 2d 259 (9th Cir.) ; *Moye* v. *State,* 122 Ga. App. 14, 16–18; *People* v. *Finch,* 47 Ill. 2d 425, 430–431; *Moore* v. *State,* 424 S. W. 2d 443, 444–445 (Tex. Crim. App.) ; *State* v. *Brown,* 76 Wash. 2d 352, 353; *State* v. *Nettles,* 6 Wash. App. 257.

testimony, concerning the psychological characteristics of recall and the dangers attached thereto, would seem to be well within the experience of men, but, in any event, it is certainly within the ken of a trial judge who must constantly deal with problems of identification. The judge below hardly needed the assistance of a psychologist and a psychiatrist to make findings concerning matters which the Supreme Court of the United States and the highest court of this Commonwealth have treated in numerous opinions. See, *e.g., United States* v. *Wade*, 388 U. S. 218, 228–239; *Commonwealth* v. *Guillory*, 356 Mass. 591, 593–594. See also *Cooper* v. *Picard*, 428 F. 2d 1351, 1354 (1st Cir.), habeas corpus issued on remand, 316 F. Supp. 856, 859–861 (D. Mass.). There was no abuse of discretion, much less constitutional error, in excluding the proffered testimony.

3. Lastly, the defendant urges as error the refusal of the trial judge to suppress "any identification evidence possibly tainted by the . . . confrontation [in the station house]" between the prosecution's chief witnesses and himself. He contends that the denial of his statutory right to use a telephone [4] compelled exclusion of all such evidence.

We have expressed the view that, notwithstanding the absence of any express penalty for violation of G. L. c. 276, § 33A, in order to make the statute an effective piece of legislation, courts should suppress unfavorable evidence gained as a result of denying a defendant the right to use a telephone. See *Commonwealth* v. *Bouchard*, 347 Mass. 418, 419–421; *Commonwealth* v. *McGaffigan*, 352 Mass. 332, 335–336. In the instant case,

---

[4] General Laws c. 276, § 33A, as amended through St. 1963, c. 212, provides as follows: "The police official in charge of the station or other place of detention having a telephone wherein a person is held in custody, shall permit the use of the telephone, at the expense of the arrested person, for the purpose of allowing the arrested person to communicate with his family or friends, or to arrange for release on bail, or to engage the services of an attorney. Any such person shall be informed forthwith upon his arrival at such station or place of detention, of his right to so use the telephone, and such use shall be permitted within one hour thereafter."

the judge refused to suppress the station house identifications of the defendant on the basis that, although the defendant was not permitted to telephone his employers within the first hour of his detention, no harm resulted because the police ultimately brought his employers to the station house. What the judge's ruling overlooks is that, in the interim, the accidental station house confrontation occurred, giving rise to evidence plainly damaging to the defendant.

While it would be difficult to show that earlier notification of the defendant's employers would have prevented the confrontation, we do not think that the defendant should be required to make this proof. We are of opinion that, whenever a defendant is *intentionally* deprived of his statutory right to seek assistance of friends or counsel by telephone, police should be held strictly to account for their conduct in relation to the defendant while he is held incommunicado. Otherwise, our prophylactic policy announced in the *Bouchard* case, *supra,* will as a practical matter be a nullity. In the instant case, there is no dispute that the violation of the defendant's right was intentional. We hold that, in these circumstances, evidence of an in-custody inculpatory statement or corporeal identification, even if accidental, should not be admitted unless the Commonwealth can show beyond a reasonable doubt that the evidence is untainted by the deprivation of the defendant's right. From our examination of the record, it is clear that the Commonwealth could not make this proof.[5]

From the police point of view, it is understandable that permission to use the telephone was denied because of the fear that the defendant might thus warn others impli-

---

[5] The fact that the evidence of the police station confrontation was not brought out in direct evidence by the Commonwealth is not decisive. On the defendant's motion to suppress the trial judge heard the evidence and then denied the motion. It makes little sense to urge that this vital and damaging evidence did not have some influence on the judge's final judgment when the case was tried before him without a jury. The defendant was purposely denied use of a telephone in wilful violation of the statute. The legislative intent was to prevent this practice. See *Commonwealth* v. *Monosson,* 351 Mass. 327.

cated in the holdup.   Nonetheless, such denial may well have prevented the defendant from obtaining counsel in time to prevent the accidental identification.   Moreover, it is at least possible that the defendant's employers, who apparently were legitimate businessmen, might have convinced the police that it was a case of mistaken identity. In the circumstances these doubts must be resolved in favor of the defendant.   We therefore reverse the judgment and direct that, in any new trial which may be held, the court should suppress evidence of the station house identifications.   Inasmuch, however, as it has been established that an independent basis exists for in-court identifications, the robbery witnesses may be again asked to identify the defendant at trial.   Whether to allow an in-court lineup or the seating of the defendant among the spectators should be in the discretion of the trial judge.

*Judgment reversed.*
*Findings of guilty set aside.*

QUIRICO, J.   (dissenting).   I am unable to agree with the conclusion of the court that because "the defendant, upon arrest, was not permitted to make a telephone call as provided by G. L. c. 276, § 33A," [1] his conviction must be reversed.   The defendant was tried by a judge, having waived his right to trial by jury, and was found guilty on the basis of the testimony of two ladies who were robbed while they were in a theatre ticket office.   Each of the ladies made an in-court identification of the defendant as one of the three robbers.

Before trial the judge heard and denied the defendant's motion to suppress "all evidence identifying . . .

---

[1] The quoted language is taken from the judge's findings of fact in connection with his denial of the defendant's motion to suppress evidence identifying him as one of the robbers.   Although the opinion of this court states that "there is no dispute that the violation of the defendant's right [to use the telephone] was intentional," the judge did not make an express finding to that effect.   For the limited purpose of this dissent it is not material whether the defendant was intentionally denied this right.

[him] as the alleged perpetrator of the crimes charged." Three weeks after finding the defendant guilty the judge filed his "Findings of Fact on Motion to Suppress." He reported his subsidiary findings concerning the opportunity which each of the two witnesses had at the time of the robbery to observe "many of the facial and physical characteristics of the defendant, and part of his clothing." He found as to each witness that "her in-court identification of the defendant was entirely independent of" her accidental view of him in the police station lobby following the robbery, and was "based on her independent recollection of the robber who confronted her in the lobby of the theatre on the night in question." He then concluded with a finding that "the failure to permit the defendant to telephone did not prejudice the defendant or violate his constitutional rights."

These findings of the judge who saw and heard the two witnesses both at the pre-trial hearing on the motion to suppress and at the trial of the case and filed by him after he had found the defendant guilty cannot be held to be plainly wrong. The judge is the person in the best position to decide whether the defendant was prejudiced in the trial before him by reason of the accidental police station viewing of the defendant by the two witnesses. It is clear from the judge's findings that he was convinced that the two witnesses would have made the same in-court identification of the defendant if the accidental police station encounter had not occurred, and that he accepted their testimony as truthful. The opinion of the court properly recognizes that "the trial was before the judge himself, a lawyer highly experienced in evaluating testimony for its reliability, and not before a jury less aware of the hazards of eyewitness identification." Therefore, we need not speculate whether the defendant might have been prejudiced in a trial before a jury. We can conclude from the judge's own reported findings that the accidental police station encounter was not a factor in his ultimate finding that the defendant was guilty.

We have held in *Commonwealth* v. *Bouchard,* 347 Mass. 418, 420–421, and again in *Commonwealth* v. *McGaffigan,* 352 Mass. 332, 335–336, that proof of denial of a defendant's right under G. L. c. 276, § 33A, as amended through St. 1963, c. 212, without proof of resulting prejudice to him, does not entitle him to a directed verdict of not guilty. In the *Bouchard* case there was a suggestion, but not a holding, that if the defendant "had made any admissions, confessed, or disclosed a lead to the discovery of unfavorable evidence" while his rights to use the telephone were denied him, "we might have held that evidence of none of them could be introduced against him," but that a violation of § 33A "should not entitle the defendant to a directed verdict of acquittal." The same suggestion was repeated in the *McGaffigan* case, at 336, but there we saw fit to add: "No penalty or other sanction is imposed for a violation of the statute. Under similar statutes in other jurisdictions, the officer who violates the statute commits a misdemeanor . . . [statutory citations from other States omitted]. We have found no statute which, having provisions similar to G. L. c. 276, § 33A, does not also provide for a penalty." In *Commonwealth* v. *Fancy,* 349 Mass. 196, 206, we referred to "the intimation in *Commonwealth* v. *Bouchard,* 347 Mass. 418, 420–421," that if a defendant in custody was denied his right to use a telephone, statements made by him during the period of such denial might be excluded from evidence. On the basis of this review I do not subscribe to the statements in the opinion of the court that by the *Bouchard* and *McGaffigan* decisions we "have expressed the view that, notwithstanding the absence of any express penalty for violation of G. L. c. 276, § 33A, in order to make the statute an effective piece of legislation, courts should suppress unfavorable evidence gained as a result of denying a defendant the right to use a telephone," and that such is "our prophylactic policy announced in the *Bouchard* case." Perhaps that should be, and perhaps that ultimately will be, our policy as applied to a case where the defendant in custody

suffers prejudice from the intentional violation of his right to use a telephone, but I do not agree that we have already so decided. Neither do I believe that this is an appropriate case in which to make such a decision. It will be time enough to decide what our policy should be when a case involving intentional violation of such a right with resulting prejudice to the defendant reaches us. I would affirm the judgment of conviction in this case.